UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 08-80073-Cr-Hurley/Vitunac

UNITED STATES OF AMERICA,

Plaintiff,

vs.

ANTHONY JACKSON,

Defendant.

_____/



FILED by _____ D.C.

DEC 0 5 2008

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

### REPORT & RECOMMENDATION

THIS CAUSE is before the Court on general Order of Reference from United States District Judge Daniel T.K. Hurley for disposition of all pending pretrial criminal motions. Pending before the Court is Defendant's First Motion to Suppress Confession (DE 85), filed November 10, 2008. The Government filed a Response (DE 90) on November 26, 2008. The Court held an evidentiary hearing on December 4, 2008. This matter is ripe for review.

### DEFENDANT'S WRITTEN MOTION TO SUPPRESS

The Defendant moves the Court to suppress a confession he made to law enforcement agents at St. Mary's Medical Center on July 4, 2008 concerning his alleged involvement in a conspiracy to traffic in cocaine for which he is now charged. The Defendant was in the hospital for treatment of gun shot wounds he incurred on July 1, 2008. The Defendant argues that his confession should be suppressed because his waiver of Miranda rights was "not voluntary as a consequence of his medication and pain management." The Defendant submits that he had been given pain medication by hospital personnel "just 3 hours before the interview" during which he made his statement. Further, the Defendant argues that his "consideration of the FD-395 advice of rights form was

compromised by both his medical condition and his pain medication."

## GOVERNMENT'S RESPONSE

The Government maintains that no objective evidence reveals any reason to invalidate the Defendant's voluntary waiver of Miranda rights. The Government submits that prior to the interview, the Defendant was read his Miranda rights and was presented with a standard FBI rights waiver form. The Government asserts that the law enforcement agents "did nothing to coerce [the] Defendant to waive his rights." The Government claims the Defendant "was alert and reported no major discomfort" and that despite "taking pain medication 3 hours before the interview he assured the agents he understood all that was occurring and wished to talk with them after waiving his rights." Further, according to the Government, the agents told the Defendant "he could stop the interview anytime he wished." The Government maintains that during the interview, the Defendant "was articulate, responsive and coherent." The Government submitted a copy of an FBI form "which details the facts circumstances and demeanor" of the Defendant "during the interview" as further support that the Defendant voluntarily waived his Miranda rights prior to making his statement to law enforcement.

## EVIDENTIARY HEARING

Detective Brian Arlotta

Detective Brian Arlotta testified first. Detective Arlotta has been employed as an officer with the West Palm Beach Police Department for over 20 years. In the seven years prior to that, he was employed as an officer with two other police departments. Detective Arlotta is currently assigned to the Federal Bureau of Investigation's Safe Streets Task Force, where he is responsible for investigating violent felons and gangs in and around Palm Beach County, Florida. Detective Arlotta

testified that he took part in the police investigation resulting in the Defendant's arrest for conspiracy to traffic in cocaine. According to Detective Arlotta, the Defendant and three other individuals went to a warehouse in West Palm Beach on July 1, 2008, armed with weapons and intending to steal cocaine. A gun battle involving the four individuals and law enforcement ensued in which the Defendant was shot and subsequently taken to St. Mary's Medical Center for treatment. Detective Arlotta testified that he first met and interviewed the Defendant around noon on July 4, 2008 at St. Mary's Medical Center in connection with the police investigation in this case.

Prior to interviewing the Defendant, Detective Arlotta spoke with the Defendant's nurse who indicated that she had talked to the Defendant throughout the morning and that the Defendant was "alert" and "comfortable." The nurse further advised that the Defendant had taken pain medication three hours prior. Detective Arlotta did not know exactly which pain medication had been taken. Detective Arlotta then met with the Defendant. Detective Arlotta identified himself and the uniformed officer accompanying him, and then explained that they were there to inquire about the incidents of July 1, 2008. Detective Arlotta could not recall if the television in the room was on or off, but knew the volume was shut off during the interview. According to Detective Arlotta, the Defendant said he was "comfortable" and "did not need any more medication." Detective Arlotta asked the Defendant general questions about his employment history and living situation, and described the Defendant as "well-spoken, calm" and "perfectly clear in speech."

After observing that the Defendant was comfortable, clear and responsive, Detective Arlotta read aloud the Miranda warnings to the Defendant as set forth in a standard FBI form. Detective Arlotta explained that he sat next to the Defendant so they could review the form together, and that the Defendant acknowledged a clear understanding of his rights as described on the form. Detective

3

Arlotta said the Defendant did not sign the form, but that he "absolutely remembers" reading to the Defendant all the rights on the form and that the Defendant said he clearly understood his rights and was willing to speak to the officers. Detective Arlotta told the Defendant that he was free to stop the interview at any time.

Detective Arlotta proceeded to ask the Defendant detailed questions about the circumstances of this case. According to Detective Arlotta, the Defendant responded by providing a detailed account of the events leading up to the July 1, 2008 warehouse incident, including a specific description of the individuals involved, their discussions before July 1, 2008 about stealing cocaine and using weapons to do it, and the specific role he agreed to play. The Defendant also gave an in-depth overview of the events of July 1, 2008, including details about the pick up of weapons and each individual before traveling from Pompano Beach to West Palm Beach, meetings between the four individuals and undercover law enforcement to discuss the details of getting to the warehouse to steal the cocaine, traveling to the warehouse in a two car caravan, and the gun battle with police. Detective Arlotta confirmed that the facts as stated by the Defendant during the July 4, 2008 interview are consistent with the known facts of this case and that the Defendant made no statements that were inconsistent with such facts.

A ten minute break was taken mid-way through the interview during which Detective Arlotta left and medical staff came in the room. Before returning to the Defendant's room, Detective Arlotta talked to the medical staff to confirm that the Defendant was comfortable. Towards the end of the interview, the Defendant told Detective Arlotta that he "just wanted to tell the truth." Detective Arlotta testified that the interview was not recorded, but that it was memorialized in his FBI report and that the other officer accompanying him was present for the entire interview. Detective Arlotta

4

further testified that the Defendant was "in custody" at the hospital and that two deputy sheriffs were posted outside of the Defendant's room during the time he was there.

In response to an inquiry by the Court about the FBI form discussed by Detective Arlotta, the Government tracked down the form. The Advice of Rights form was admitted as Government Exhibit 1 and bore the signature of the Defendant and Detective Arlotta as a witness. The signed form was dated July 4, 2008 and time stamped 11:56. Upon being presented with the form, Detective Arlotta explained that while he did not specifically recall the Defendant signing the FBI form, as he had testified earlier in the hearing, if he had the Defendant sign the form, it would have been out of habit since he routinely asks individuals to sign such forms in state cases.

Anthony Jackson

The Defendant testified next. The Defendant confirmed that he was shot during the July 1, 2008 warehouse incident, was administered first aid on the scene, and was subsequently taken to St. Mary's Medical Center. At first, the Defendant stated that he was taken to the hospital involuntarily but later admitted that he wanted to be taken to the hospital to receive treatment after having been shot. He stated that his injuries did not require surgery but that his wounds were stapled. He further described his pain on all four days after arriving at the hospital as being a "9 or 10" out of a "10" scale from mild to severe pain. He stated that he was in extreme pain and discomfort and that the pain medication, which he described as "sleeping pain medicine," helped with the pain by causing him go to sleep. He could not recall the pain medication that he was given but claimed to have slept for most of the time that he was in the hospital.

The Defendant confirmed that Detective Arlotta came to meet with him on July 4, 2008. He stated that he had last received pain medication three or four hours before Detective Arlotta arrived.

The Defendant stated that Detective Arlotta told him he had rights, but did not talk about the consequences of those rights. The Defendant testified that he "did not understand his rights" and that Detective Arlotta said "whoever talks first will get the best deal." At first, the Defendant stated that Detective Arlotta did not specifically tell him he had the right to remain silent or that he had the right to counsel, but later stated that Detective Arlotta specifically advised him of his right to remain silent. The Defendant stated that he read the FBI form containing his Miranda rights before signing it, but maintained that he was not in his right mind due to having been under medication at the time. The Defendant confirmed that he told Detective Arlotta that he was "feeling pretty good" considering he had been shot. The Defendant, a convicted felon, stated that he had been advised of his Miranda rights on other occasions prior to July 4, 2008. Defendant stated that he never asked for medication during the interview, nor did he ever ask to stop the interview.

## DISCUSSION

The issue before the Court is whether the July 4, 2008 statements made by the Defendant to FBI agents concerning his participation in the drug trafficking conspiracy were obtained in violation of the Defendant's Miranda rights. In Miranda, the Supreme Court held that law enforcement officers may not conduct a custodial interrogation unless the person questioned is first "warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Miranda v. Arizona, 384 U.S. 436, 444 (1966). Evidence obtained as a result of a custodial interrogation is inadmissible unless the defendant is first warned of his rights and knowingly waives those rights. Id. at 444-45; Sullivan v. Alabama, 666 F.2d 478, 482 (11th Cir. 1982).

Where an interrogation continues in the absence of counsel for the defendant, the government

6

must show that the defendant made a knowing, voluntary, and intelligent waiver of his constitutional

rights. Miranda, 384 U.S. at 475; Sullivan, 666 F.2d at 483. The Supreme Court has described this

standard as having two distinct requirements:

> First, the relinquishment of the right must have been voluntary in the sense that it was
> the product of a free and deliberate choice rather than intimidation, coercion, or
> deception. Second, the waiver must have been made with a full awareness of both the
> nature of the right being abandoned and the consequences of the decision to abandon
> it. Only if the totality of the circumstances surrounding the interrogation reveal both
> an uncoerced choice and the requisite level of comprehension may a court properly
> conclude that the Miranda rights have been waived.

Moran v. Burbine, 475 U.S. 412, 421 (1986) (internal quotation marks and citations omitted); United

States v. Barbour, 70 F.3d 580, 585 (11th Cir.1995)(adopting Moran test); see also Hart v. Attorney

General of State of Florida, 323 F.3d 884, 892 (11th Cir. 2003).

As to the first requirement, whether the waiver was voluntary, the fact that a defendant

suffers a mental disability, whether drug-induced or otherwise, does not alone render a waiver

involuntary; instead, there must be coercion by an official actor. Barbour, 70 F.3d at 585 (citing

Colorado v. Connelly, 479 U.S. 157, 169-70 (1986)). As to the second requirement, whether the

waiver was made with "a full awareness of both the nature of the right being abandoned and the

consequences of the decision to abandon it," a defendant's impaired mental state, whether drug

induced or otherwise, may prevent him from understanding the nature of his waiver. Id. (citing

Coleman v. Singletary, 30 F.3d 1420, 1426 (11th Cir.1994)).

The threshold inquiry is whether the Defendant was informed of his Miranda rights.

Detective Arlotta testified that he read aloud the Miranda warnings to the Defendant. Although

Detective Arlotta stated at first that the Defendant did not sign the FBI form, the Government

ultimately produced, upon inquiry of the Court, an Advice of Rights form showing that he and the

Defendant both signed the form on July 4, 2008. The Defendant himself admitted at the hearing that he read and signed the form on that date. Thus, this threshold inquiry is met.

Next, the Court turns to the Defendant's argument that he did not waive his Miranda rights voluntarily, knowingly, and intelligently. In this case, there is no evidence of police intimidation, coercion, or deception. Three days passed between the shooting and the interview so the Defendant had time to receive treatment and recover. The Defendant testified that, on July 4, 2008, Detective Arlotta merely told the Defendant he had rights, without specifically identifying those rights, and told him "whoever talks first will get the best deal" when giving him the form, however the Defendant's testimony was fraught with contradictory statements and he later admitted that Detective Arlotta specifically read him his Miranda right to remain silent. On the other hand, Detective Arlotta credibly testified that he identified himself and explained that he was there to talk about the July 1, 2008 incident, read aloud all the Miranda rights to the Defendant, that the two read the FBI form together, and that the Defendant acknowledged a clear understanding of his rights and said he was willing to talk.

The Defendant maintains that given his medicated state, he did not understand his rights or the consequences of waiving those rights. The Court acknowledges that a person's mental capacity may be affected by pain and the effects of pain medication, which is relevant to whether that person could have understood the nature of his rights being abandoned and the consequences of the decision to abandon those rights. In this case, however, Detective Arlotta testified that, before meeting with the Defendant, he consulted with the Defendant's nurse who informed him that the Defendant was "alert" and "comfortable." The nurse told Detective Arlotta that the Defendant had last taken pain medication three hours prior to the time Detective Arlotta arrived at the hospital. The Defendant

8

testified that his last dose of pain medication was taken three or four hours before the interview. Detective Arlotta further testified that before and at the time the Defendant was read his warnings and signed the Advice of Rights form, the Defendant was responsive and "well-spoken, calm." The Defendant's speech was "perfectly clear" and the Defendant indicated that he did not need any more medication and appeared "comfortable." Moreover, the Defendant provided a detailed and thorough statement to Detective Arlotta that is consistent with the known facts of this case. Under the circumstances, the Court declines to find that, at the time he signed the waiver, the Defendant was suffering from a medication or pain-induced impaired mental state that would be sufficient to invalidate his waiver.

In sum, viewing the totality of the circumstances, there is no credible evidence of police coercion or misconduct, the Defendant signed the waiver, was alert in prior conversations with medical staff, was clear and responsive during the interview, made no attempts to stop the interview or otherwise ask for pain medication during the interview, did not appear visibly impaired or in discomfort, and provided a detailed and accurate account of events consistent with the known facts of this case. These circumstances support a finding that the Defendant had a clear awareness of the nature of his Miranda rights and made a knowing, voluntary, and intelligent waiver of those rights. Accordingly, the Defendant's statements to Detective Arlotta on July 4, 2008 should not be suppressed.

## RECOMMENDATION

Based on the foregoing, this Court respectfully recommends to the District Court that Defendant's First Motion to Suppress Confession (DE 85), filed November 10, 2008, be DENIED.

A party shall serve and file written objections, if any, to this Report and Recommendation

with the Honorable United States District Judge Daniel T. K. Hurley, within ten (10) days after being served with a copy. See 28 U.S.C. § 636(b)(1)(C). Failure to file timely objections may limit the scope of appellate review of factual findings contained herein. See United States v. Warren, 687 F.2d 347, 348 (11th Cir. 1982) cert. denied, 460 U.S. 1087 (1983).

DONE and SUBMITTED in Chambers at West Palm Beach in the Southern District of Florida, this _____ day of December, 2008.

ANN E. VITUNAC
United States Magistrate Judge

Copies to:
Honorable Daniel T.K. Hurley
All counsel of record

10